# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

          **Plaintiff,**

v.

          **Case No. 10-C-833**

ABBOTT LABORATORIES,

          **Defendant.**

---

## DECISION AND ORDER

---

        This age discrimination action arises out of Defendant Abbott Laboratories' ("Abbott") decision to terminate the employment of 54-year old, long-time sales representative, John Ziegler ("Ziegler") on February 3, 2006. The Plaintiff, the Equal Employment Opportunity Commission ("EEOC"), alleges that Abbott's termination of Ziegler's employment violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1).

        This Decision and Order addresses Abbott's motion for summary judgment dismissing this action and the EEOC's motion to amend or correct the summary judgment record. This Court has jurisdiction over the EEOC's claims pursuant to 28 U.S.C. §§ 451,

1331, 1337, 1343, and 1345, and 29 U.S.C. § 626(b). Venue is proper in this District pursuant to 28 U.S.C. § 1361(b)(2).[1]

## MOTION TO CORRECT THE RECORD

The Court begins by addressing the EEOC's three-part motion to correct the record. (ECF No. 61.) First, the EEOC wants to correct paragraph 53 of its statement of additional facts ("AF"). Abbott does not oppose the request. The proposed AF is corrected so that Julee MacGibbon ("MacGibbon") said the "1 sales" mentioned in her evaluation was a reference to Ziegler, as stated in her deposition cited in AF ¶53, instead of "1 service."

Second, the EEOC wants to correct purported mistakes in Abbott's response to the EEOC's AF, paragraph 2, that Donald Heston ("Heston") is "older than Ziegler," because Heston's date of birth (August 6, 1951), is later than Ziegler's (April 10, 1951). Abbott indicates that the four-month difference is immaterial because both men are over 55 and the correction will not affect the outcome of the summary judgment motion.

The EEOC's paragraph 2 states that "[a]ccording to Abbott's list of Ziegler's comparators, he was the second-oldest among all 100 ADD account representatives nationwide." (*See* Abbott's Resp. AF ¶ 2.) (ECF No. 58.) Abbott responded, in pertinent part, that it "disputes the first sentence of Paragraph 2, because the cited list shows two salespeople (Heston (at EEOC000965) and Barbara Sullivan (at EEOC000967)) older than Ziegler." (*Id.*) Abbott's response to the proposed fact lacks factual support because Heston is younger than

---

[1] *See Rebar v. Marsh,* 959 F.2d 216, 218 n.5 (11th Cir. 1992) (holding general venue provisions apply to federal employee actions against the government under the ADEA.)

2

Ziegler. Therefore, Abbott has not raised a genuine issue of fact as to that AF, and it will be included in the relevant facts. Also, contrary to the EEOC's response to the motion, neither man was 55 as of February 3, 2006.

Third, the EEOC wants to correct the purported mistake in Abbott's reply memorandum in support of its motion for summary judgment, page two, that there were six "sales representatives" over 55 in the region managed by MacGibbon in 2006. The third correction goes to the proper identification of the ADD salespeople and Abbott's argument. That request is denied. Abbott may present its argument The Court's role is to resolve those arguments, not edit them to conform to the position of the opposing party.

## SUMMARY JUDGMENT STANDARDS

An initial question is whether there is a genuine dispute of material fact precluding resolution of this action upon summary judgment. In making that determination, the Court applies the following criteria to Abbott's proposed findings of material facts (SOF) and the EEOC's AF.

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, "[a] party may move for summary judgment, identifying each claim . . . on which summary judgment is sought." This Court must view the facts in the light most favorable to the non-movant, resolving all evidentiary conflicts in her favor and according it the benefit of all reasonable inferences that may be drawn from the record. *See O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

3

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Put another way, summary judgment is appropriate when there are no genuine factual issues that could lead a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

Although the moving party bears the initial burden of informing the Court of the basis for its motion, it may satisfy its burden by simply showing or pointing out to the Court that there is an absence of evidence supporting the non-moving party's case. *Celotex,* 477 U.S. at 325. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to withstand summary judgment. *See Anderson,* 477 U.S. at 252.

Summary judgment is not a substitute for a trial on the merits or a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994). But if it is clear that the non-movant will be unable to establish an essential element of his claim, summary judgment is not only appropriate, but mandated. *Massey v. Johnson,* 457 F.3d 711, 716 (7th Cir. 2006) (citing *Celotex,* 477 U.S. at 322-23).

4

*Relevant Facts*[2]

The EEOC, the federal agency charged with administering, interpreting, and enforcing the ADEA, brings this action on behalf of Ziegler, a Wisconsin resident born April 10, 1951, against Abbott,[3] an Illinois corporation with its headquarters in Abbott, Illinois. From February 2, 1976 until February 3, 2006, Ziegler, was an Abbott employee, working principally as a salesperson in Abbott's diagnostic division ("ADD"). Sales representatives like Ziegler sold the full Abbott ADD line of equipment and reagents, and were the most common contact between the customer and Abbott. It is a matter of opinion whether they are the "face" of Abbott to customers. (MacGibbon Dep. 22) (ECF No. 42-2.)

In 1999, as a result of a Food and Drug Administration ("FDA") enforcement action, Abbott signed a consent decree with the FDA and agreed to stop manufacturing and distributing many of its chemical tests, including certain of the diagnostic tests sold by ADD sales persons. This had a negative impact on product availability and caused customers to look for different suppliers. The consent decree, which remains in effect, impacted the sales of the entire ADD sales organization.

From 2002 through 2006, ADD was in the business of manufacturing and selling clinical diagnostic systems used by hospitals to monitor medication levels and to assist in the

---

[2]The statement of relevant facts is based Abbott's "statement of undisputed material facts" ("SOF") and the EEOC's AF to the extent that they are undisputed. Citations to all quoted excerpts are included. Arguments, slanted language, and legal conclusions are not within the ambit of proper proposed factual findings, and have been excluded.

[3]During the 2002 through 2006 time period, Abbott had four main operating divisions: (a) Diagnostics ("ADD"); (b) Abbott International ("AI"); (c) Pharmaceutical Products ("PPD"); and (d) Ross Products ("Ross") and TAP Pharmaceutical Products ("TAP"), a 50/50 joint venture with Takeda Pharmaceutical Company, Ltd.

5

diagnosis and treatment of disease. Its products included instruments and reagents used to generate results, principally the ARCHITECT and AxSYM for Immunoassay and Cell-Dyn for Hematology.

From 2002 through 2006, ADD's sales organization was divided into regions, each made up of several geographic sales districts. When Abbott terminated Ziegler's employment he was, at 54, the second oldest ADD account sales representative in the Chicago/Milwaukee District and the Central Region.

From 2002 to late 2004, Ziegler worked as a salesperson in the Green Bay/Milwaukee District of ADD's Central Region. Katherine Reinke ("Reinke"), born on March 2, 1959, was Ziegler's manager in that district from September 2002 until December 2004.

At various times from 2002 through 2004, the following salespeople also worked in the Green Bay/Milwaukee District:

Michael McDonald ("McDonald), born April 11, 1959

John Moskal ("Moskal"), born August 25, 1959

Thomas Novak ("Novak"), born November 11, 1959

Michael Rowan ("Rowan"), born on February 26, 1976.

Michael Davis ("Davis"), born January 25, 1961

Christopher Lindley ("Lindley"), born May 19, 1971

James Murrow ("Murrow"), born June 29, 1955

6

James O'Brien ("O'Brien"), born March 7, 1963

Peter Weyhrich ("Weyhrich") born August 10, 1961

Terry Zocher ("Zocher"), born on November 1, 1967.

Amy Peterson ("Peterson"), born January 1, 1976

In late 2004, ADD's sales force was reorganized and the Green Bay/Milwaukee District was combined with the Chicago District; the combined territory, which included Chicago and Southeastern Wisconsin, became known as the Chicago District. In December 2004 as part of that reorganization, MacGibbon, born October 21, 1964, assumed Reinke's job duties. MacGibbon was responsible for sales- and servicepeople in the Chicago District, and her title was Area Director for the Chicago District. In 2004, Reinke and MacGibbon reported to Louis, known as "Skip," Baldino ("Baldino"), Vice President of Sales for the Central Region.

In early 2005, MacGibbon hired Glenn Mason ("Mason") to serve as the Sales Manager for the Chicago District. During 2005, Mason was responsible for supervising several salespeople including Peterson and Lindley. During that same time period, MacGibbon supervised the other salespeople in the Chicago District.

In January 2006, as part of another reorganization, MacGibbon became Regional Manager for the Chicago Region, and was no longer responsible for service employees. She was responsible only for salespeople, but for a larger geographic area that included the entire Midwest. During 2005 and into early 2006, the following salespeople were also in Ziegler's

7

district:  Lindley; Julie Hoschek (Walz) ("Hosckek"), born November 13, 1977; Peterson; Murrow; Callie Ginter, born September 29, 1970; and Weyhrich.[4]  MacGibbon reported to Baldino until late 2005, when Baldino left ADD for another position within Abbott. Following Baldino's departure, MacGibbon's manager was Joseph Rytell ("Rytell"), who became Vice President of U.S. Sales for ADD.

### Sales Incentive Programs & Ziegler

Abbott has sales representative incentive programs that generally have a $10 million budget.  These programs include bonuses, quarterly awards, and membership in the President's Club, an annual sales recognition award for ADD salespeople that ranks them competitively from most to least successful.  Depending upon the sales goals and the criteria set in a particular year, ADD sales personnel who are at the top of the rankings, also referred to as "stack rankings," are named to the President's Club.  As a part of inclusion in the President's Club, those who qualify and rank highest for the year are given a special trip to places such as Rome or Bora Bora.  In 2005, only 13 sales representatives earned the trip by meeting some base "qualifiers" and being one of the best performers.  Ziegler went on the President's Club trip four times in his last 15 years with the company: 1993, 1995, 2001, and 2002.  Ziegler earned "Senior Sales" status in 1986, an honor that requires meeting rankings within the sales organization and membership in the President's Club a number of times.

---

[4]There is a dispute as to whether Jason Storlie ("Storlie") born on March 31, 1971, was in Ziegler's district in 2005.  (*See* EEOC Resp. SOF ¶ 15.) (ECF No. 42.)

While in his 40's and 50's, Ziegler had a mixed record with respect to the President's Club. He was ranked 123 out of 158 in 1996; 78 out of 101 in 1997; 83 out of 99 in 1998; 51 out of 96 in 1999; and 46 out of 157 in 2000. Beginning in 2001, Ziegler's ranking was as follows: 32 out of 180, and in the President's Club in 2001; 15 out of 102, and in the President's Club in 2002; 52 out of 86 in 2003 (although for the first half of the year he was one of the top five sales representatives); 62 out of 92 in 2004.

Ziegler's 2005 sales totaled $3,216,633, which included $707,370 of capital sales (273% of his goal) and $2,509,263 of reagents and service (88% of his goal), for a combined 104% of his "TOTAL" goal that year.[5]

*ADD Sales Goals and Rankings*

From 2002 through 2006, ADD salespeople were ranked based upon sales goals set at the beginning of each year. The sales goals varied from year to year, depending upon the sales strategy set by ADD management. In 2005, the categories used to measure sales performance for the President's Club were instrument sales, new business, and service contract renewals, and there were two qualifiers for the President's Club: a sales representative had to reach 100% of his/her capital goal and 100% of his/her reagent and service goal. However, in 2002, the categories used to measure sales performance were sales of total immunoassay reagents (chemicals used to produce lab results), sales of all other reagents, and total capital sales.

---

[5]There is a factual dispute regarding some of Ziegler's rankings for 2005. (*See* Abbott's Resp. AF, ¶ 5.) There is also a factual dispute regarding whether Ziegler received merit raises in 2004 and 2005. (*See id.* at ¶ 16.)

Similarly, the relative weighting of the goals used in a particular year varied. In 2002, the categories were weighted as follows: (i) dollar growth over base of immunoassay reagents was 25%; (ii) percent growth over the base of immunoassay reagents was 25%; (iii) dollar growth over the base of other reagents was 12.5%; (iv) percent growth over the base of other reagents was 12.5%; and (v) total capital sales were 25%. Effective April 1, 2005, the categories were weighted as follows: (i) year to date reagent percent of goal was 20%; (ii) total new business dollars for the year was 25%; (iii) total new business as a percent of 2004 base sales was 25%; and (iv) total instrument dollars for the year was 30%. In 2005, bonuses were paid quarterly based on "Y[ear] T[o] D[ate] Actual v. Goal Total Plan." (See AL 00279, AL 2791.) (ECF No. 38-17.)

*Effects of Consent Decree*

As of 2003, due to lingering effects of the consent decree, Abbott continued to see some customers nervous about "entering into big contracts." (MacGibbon Dep. 110.) Abbott's forecast showed that, after reaching a low point in 2003, it planned to gradually regain its "Division Margin," and return to 1999 levels by 2006. Beginning in 2003, notwithstanding the continuing consent decree, ADD management directed that the sales organization move from a "maintenance of business" strategy to a strategy focused on growing business and improving customer service. ADD management established a three-phase strategy in 2003 that focused on stabilizing the business by the end of the year, returning the business to profitable growth between 2004 and 2006, and becoming a market leader in 2007

10

and beyond.  Baldino presented a document entitled *Take Back the Lead, Transforming ADD,*
*Creating a Customer Focused Organization, Diagnostics Breakthrough* to his staff as part of
developing the three-phase strategy to address the consent decree and get back into a
leadership position.  (Baldino Dep. 264, Ex. 117, AL 009487.) (ECF Nos. 43-1, 43-5, 65-1,
65-2.)

*Abbott's Performance Evaluation Standards*

From 2002 through 2006, ADD utilized a performance evaluation system that
evaluated employees in three categories: (1) core job responsibilities; (2) goals; and (3)
competencies.  Each category accounted for one-third of the employee's overall performance
evaluation.  The goals section of the performance evaluation addressed whether a salesperson
had met the targets that were set for that year's sales cycle for the various products he or she
sold.  Sales were not given any greater weight than the other performance categories measured
in his or her evaluation.  Sales goals were not only measured for purposes of performance
evaluations, but also for determining cash awards, bonuses, and inclusion in the President's
Club.  The employee received one of four overall ratings:  exceeded expectations ("EE"),
achieved expectations ("AE"), partially achieved expectations ("PA"), or did not achieve
expectations ("NA").  The majority of Abbott employees received an AE.  The general
distribution of performance ratings was 10% EE, 85%  AE, and 5% PA or NA.

11

*Ziegler's Performance*

In 2002, Ziegler received an overall EE rating from his supervisor, Reinke. Baldino signed Reinke's 2002 performance review of Ziegler in late March 2003, after Reinke had presented it to Ziegler.

For 2003, Reinke gave Ziegler an overall PA rating, consisting of AE ratings for core job responsibilities and competencies, and a PA for goals. Reinke stated that she wanted to see Ziegler "focus and practice the Face-to-Face model on all of his sales calls moving forward," (Reinke Dep. Ex. 29, EEOC 000117.) (ECF No. 44-1), not to let customers get him off track, and to "stay the course and get on those selling shoes again." *Id.* Reinke additionally noted that Ziegler needed to "assume much of the responsibilities" for his accounts and "establish a concrete Account Specific Plan for his top 10 accounts." (*Id*. at EEOC000118 & EEOC000121.)

The 2003 evaluation rated Ziegler as EE in regard to product knowledge; stating:

"2003 was a trying year, even with many things out of his control [Ziegler] was able to successfully secure much of his I[mmuno] A[ssay] business and was consistently in the top 5 A[ccount] E[xecutive]s in the country during the first half of 2003"

(*id.* at EEOC000118); and for "Adaptability" gave an AE rating and stated:

With the ever-increasing demands put on the Key Account Executives, it becomes very important for them to be flexible. [Ziegler] exhibited this behavior as the year went along and product availability became an everyday nightmare to contend with. [Ziegler] adjusted effectively and worked within the allocations and processes that went with it.

12

(*Id.* at EEOC000119.)

> Reinke also wrote in 2003:

> [Ziegler] has always been a consistent contributor to the local team[']s success and the division[']s success through the years. You can always look to [Ziegler] to somehow find the 'silver lining' when faced with adversity. He embraces the team player concept and is always there to help his fellow 'soldiers' out whenever he can. [ . . . ] [ . . . ] [Ziegler] is very driven to succeed. I am very pleased to have him as a major contributing member of the Milwaukee Team.

(*Id.* at EEOC000121.)

> Ziegler wrote the following in his 2003 performance review:

> 2003 was a challenging year for everyone in ADD. It was the 4th year of the Consent Decree and we were constantly plagued with serious allocations, backorders and customer stock outs. In many cases customers had lost their faith in Abbott . . . and many had taken their business elsewhere. In spite of it all I stayed the course and thru sheer determination was able to hold on to most of my base business.

(*Id.*) MacGibbon did not have any role in drafting the 2003 evaluation. Baldino approved the ratings and signed Ziegler's 2003 performance review on April 6, 2004.[6] Ziegler did not think age was the reason Reinke rated him PA that year, (Ziegler Dep. 99:25-100:2) (ECF No. 45-1.); he was told by Reinke that it was because of the drop in his [sales] numbers. (*Id.* at 91:7-91:23.)

---

[6]There is a factual dispute regarding what role, if any, Baldino had in drafting the 2003 evaluation. (EEOC Resp. SOF ¶ 33; Abbott Resp. AF ¶ 28.) (ECF Nos. 42 & 58, respectively.)

13

During most of 2004, Ziegler reported to Reinke who continued to note issues with his performance, including her observation that Ziegler was not "taking the actions to drive for the results required based [on] . . . what the goals were, the requirements of the job." (Reinke Dep. 77:4-7.)  His 2004 evaluation states that in regard to product knowledge, "[Ziegler] has many years of experience in our business and from that has a vast knowledge about the assays and the clinical utility of those assays." (MacGibbon Dep. Ex. 30, EEOC 000125) (ECF No. 42-3.); in regard to Teamwork, it was noted that "[Ziegler] did help out the Abbott team on many occasions sourcing kits when there was an allocation or backorder. He also has been resourceful in coordinating the efforts for the state bid for Abused Drugs leveraging our Public Affairs group." (*Id.* at EEOC000130.)

In May 2004, Reinke received a complaint from a customer, Waukesha Memorial Hospital ("Waukesha Memorial"), regarding its attempts to obtain a service contract proposal from Ziegler.  The complaint was resolved and did not disrupt Abbott's relationship with the client.

In August 2004, Reinke reminded Ziegler of the need to "meet your goals on New Products."  (Hennessy Aff. ¶ 16, Ex. 3 AL 003589.) (ECF No. 38-7.)  Reinke stated that Ziegler must target all his accounts, regardless of whether they were currently using Abbott products, and she asked him for a plan to achieve this goal, by account.  Reinke's advice relating to new products and Ziegler's BNP plan[7] also praised his "great job" on AxSYM

_____

[7]Other than indicating that "BNP" is part of the AxSYM for Immunoassay, (*see* Ziegler Decl. Ex. B) (ECF No. 48-1), the parties' submissions do not explain or define "BNP."

14

Havab-M and Havab.  In a September 3, 2004, email to Zeigler and others in the District, Reinke again congratulated Ziegler on being the first of the Milwaukee team to close a Havab sale.  (Ziegler Dec. ¶ 3, Ex. A, WK 003605.)

MacGibbon replaced Reinke as Ziegler's supervisor in December 2004, but Reinke prepared his 2004 evaluation which MacGibbon presented to Ziegler in March 2005. Reinke could not recall if either MacGibbon or Baldino had input into the manager's comments in the evaluation.  Both MacGibbon and Baldino testified at their respective depositions that they did not have any role in drafting the evaluation or comments.

In 2004, Reinke gave Ziegler a PA rating.  In her 2004 review of Ziegler, Reinke specifically noted that:

> During my travels with [Ziegler] I identified the need to properly prepare for the sales calls and once in the call, move through the basic components.  During the years while we were in the Consent Decree it was a challenge to stay on message and sell. Now with all of the New Product launches, there should be no reason for [Ziegler] not to do proper planning and make sure he utilizes the proper skills.  During 2004 [Ziegler] struggled with implementing this core job responsibility during each and every call.

(Reinke Dep. Ex. 30, EEOC 000125.)  Reinke also remarked that "[Ziegler] focused on back-orders and allocations sometimes to his detriment. I reiterate what I would say to [Ziegler] during our travels, if we aren't talking about our new products and presenting them to our customers with enthusiasm, nobody else will do it for us." (*Id.*)  Regarding Ziegler's sales goals for 2004, Reinke stated that "[Ziegler]'s execution on new product introductions

15

was not at the level expected for 2004;" that "[m]any of [Ziegler]'s customers did not consider Abbott as a viable competitor in 2004. [Ziegler] will need to ensure we are in the game in the future if we are to win;" that "[Ziegler] did not meet his New Product Sales goals for 2004" and that "pre-call planning, and being diligent in developing account level strategy's [sic] and executing the strategy are area's [sic] [Ziegler] needs to improve in moving forward." (*Id*. at EEOC 000128.)

Reinke's 2004 assessment of Ziegler's competencies concluded that the core competency of "adaptability" was what Ziegler

> struggled with . . . the most. ADD has changed . . . changes require each individual to adapt. On many occasions [Ziegler] wanted it to be like *'the past'* but it is a whole different world. Our business demands are different, our customer demands are very different. It is [Ziegler]'s responsibility to stay on top of these changes and adapt to the changing environment.

(*Id*. at EEOC 000130.) (Emphasis added.) She also noted that on the initiative competency, Ziegler failed to take initiative to launch new products within his territory, particularly at the University of Wisconsin. Reinke concluded that the "University of Wisconsin's desire to have a different Account Executive is an example of [Ziegler]'s Inability [sic] to deliver in 2004." (*Id*. at EEOC 000131.)

In her overall summary of Ziegler's performance, Reinke commented that "[Ziegler] was especially challenged to 'move forward' our business in many of his accounts;" "[Ziegler] had difficulty transitioning from the 'consent decree' phase to one of execution and closing of new business in his territory;" and she "was especially disappointed when Med

16

Science announced they were going to transition all of their [Immunoassay] business . . . I believe [Ziegler] should have established a much stronger relationship [with Med Science's primary decision makers]." (*Id*. at EEOC 000133.) Ziegler believes the losses at Med Science were related to the consent decree and product availability issues.

Reinke also noted that, although Abbott had faced many issues with back-orders and allocations as a result of the consent decree, during her "repeated field travels with [Ziegler], [she] reemphasized the need to present the Architect VID at each and every call. [Ziegler] seemed very uncomfortable in executing on this request. It was the difference between success for some of [the] Account Executives in 2004 and continued sales erosion for others." (*Id*. at EEOC 000133.) Ziegler felt that in 2004 he used the Architect VID presentation with his customers as appropriate, but not on every call or with every customer, because in some cases it would have been irrelevant or not of value.

Reinke additionally stated that that she "asked [Ziegler] to put together 'your BNP [new product] plan by account.' Strategy, planning, execution is what it takes. I did not see that from [Ziegler ] in 2004." (*Id*. at EEOC 000133.) Ziegler's response emphasized his use of account specific strategies. (*Id*. at EEOC 000138, Goal 5 Result.) In late March 2005 Baldino and MacGibbon signed Ziegler's 2004 performance review.

For 2004 Ziegler wrote regarding the consent decree and sales:

2004 was a very challenging year. While in general I had been able to minimize/forestall sales erosion, with Consent Decree memories still lingering and continued multiple Allocations, Backorders, and associated customer Stock Outs we reached the

17

proverbial 'last straw' for several customers.  However, even as
negative events occurred positive things were occurring such that
I think my territory has bottomed out, turned, and now on the rise
for 2005. After the night there is always a sunrise.

(*Id*. at EEOC 000143.)

*Ziegler Under MacGibbon's Supervision*

When MacGibbon took over in 2004, Reinke informed MacGibbon about the

performance issues she had been experiencing with Ziegler.  MacGibbon also began to receive

direct feedback from customers concerning Ziegler's performance.  In December 2004,

University of Wisconsin-Madison ("UW-Madison") complained to MacGibbon about

Ziegler's performance, stating that they did "not have confidence in [Ziegler's] ability to help

them achieve their future goals."  (Hennessy Dep. Ex. 65.)  (ECF No. 38-26.)  As a result of

UW-Madison's complaint, MacGibbon transferred this account to Weyhrich.

Ziegler believes that his removal from the UW-Madison account related to the

a 2002 incident when the account notified Ziegler that it was going to discontinue testing with

Abbott; after much negotiation and deliberation, Ziegler was able to solidify the business for

two more years.  (*See* MacGibbon Dep. Ex. 46, EEOC001210.) (ECF No. 38-9.)  Ziegler also

worked on a major Ax SYM BNP sale in November 2004 at UW-Madison, which brought

praise from MacGibbon and Ronald Burke ("Burke") ADD Central Area Operations Manager.

(Ziegler Dec. ¶ 4, Ex. B, WK 003606, WK 003608.)

On March 22, 2005, MacGibbon went on field travel with Ziegler to Waukesha

Memorial and Kenosha Hospital. She sent him a field travel report on April 4, 2005, which

18

states in part: "Your call objectives for our travel day were very specific. They were directly related to your current business initiatives at each account. I see an improvement in your focus with each account. We walked away from each call, having moved the customer closer to your goal." (See *Id*. ¶10, Ex. E, WK 001256-57.) Through March 2005, Ziegler was the second leading sales representative for immunoassay closes "Y[ear] T[o] D[ate]."

In April 2005, Baldino traveled with Ziegler on two sales calls.[8] Following the calls, Baldino sent an email to Ziegler and MacGibbon providing his assessment of the calls. Specifically, Baldino's April 21, 2005, email made the following observations: "doesn't appear that [product knowledge] is one of [Ziegler's] separating strengths;" Ziegler was "timid" and failed to be "concise" in his sales negotiation strategy; Ziegler failed to have specific plans for the opening and closing of his calls; and Ziegler lacked knowledge of contracts and "product usage." He also noted that Ziegler failed to have a full day of travel and instead visited only two customers, which surprised Baldino because he couldn't "think of the last time [he] travelled [sic] with someone where [he] didn't have an intense full day," Ziegler did not come across as: "EXCITED, CONFIDENT, READY TO GO, PROUD, FIRED UP AND READY TO PROVE [ABBOTT HAS] THE BEST SOLUTION," and Ziegler lacked the necessary "energy and excitement level" about Abbott's products. (Baldino

---

[8]There is a factual dispute between the parties as to whether Ziegler asked Baldino to travel with him or whether Ziegler was informed that Baldino wanted to travel with him. (*See* EEOC Resp. SOF ¶ 48.) The dispute is not material.

19

Dep. Ex. 31.) (ECF No. 38-16.) Baldino's email included the following statements "You have 29 years with ADD;" and "At Abbott over 29 years." (*Id*.)

The email from Baldino noted that the call on Dynacare Laboratories ("Dynacare") "accomplished your objectives;" that it was "hard to truly access [sic] [Ziegler's product knowledge] in one day;" and "hard to access [sic] [Ziegler's Sales Negotiation/Objection Handling/Delivery] in one day." (*Id*. at EEOC 000146; EEOC000148.) The email also described Ziegler's energy and excitement level as "perhaps the single greatest area of concern that I see in your "style" during our travel (and other times we have been together for meetings, etc.)" (*Id*.) Baldino also stated "I have not known you your entire career, but I think instinctively you must have exhibit these traits at some point in your career—you have a number of PCLUBs under your belt. You have enjoyed success many, many times over a 29 year career." The email also states, regarding Ziegler's "Energy and Excitement Level," that he had to "get that 'swagger' back . . . FIND IT [Ziegler]! REACH DEEP IN YOUR SOUL—SEE IF YOU CAN BRING IT BACK TO YOUR SURFACE. WITHOUT IT, YOU WILL NOT BE SUCCESSFUL THIS YEAR." (*Id.* at EEOC 000149.)

According to Baldino, he highlighted Ziegler's 29-year career at Abbott "[b]ecause [his seniority is] a strength that I wanted to see [Ziegler] recognize his strength. And he and I both agreed numerous times that he brought it up that it was a strength, it was something that he had an unique advantage, just as Jim McAllister and Joy Burgamy, who had

20

about the same amount of tenure as I did and [Ziegler] did." (*See* Abbott App. filed Aug. 6, 2012 ("ASA"), Ex. B (Baldino Dep. 186:5-13).) (ECF No. 58-3.)

In response to Baldino, Ziegler thanked him for his advice, stating he found it "very insightful" and that he "read it several times and printed it for future reference." (Ziegler Dep. Ex. 9.)  He stated he would "come thru" . . . "[w]ith smart work, hard work, drive, creativity, positive attitude, and persistence;" that he made additional calls that day; and that he loved working at Abbott.  (*Id.*)

At his June 27, 2012, deposition, Ziegler said that he had no reason to believe, "[a]t least at that time," that any of Baldino's assessments were motivated by Ziegler's age. (Ziegler Dep. 151:11-20.) (ECF No. 38-5.)  Ziegler stated he was "dead tired" on the day he traveled with Baldino, and he declined to speculate about whether Baldino's reaction was to his age.  (Ziegler Dep. 152:22 -153:19.)

The format Baldino used for his assessment of Ziegler in April 2005, including his references to excitement and energy level, was consistent with the types of performance criteria he uses when assessing all salespeople.  According to Baldino, "[t]ravel days, account specific details, pre-call planning, have a relationship with your customers . . . and excitement and energy level" are  "the key ingredients . . . for sales excellence."  (Baldino Dep. 195:10-19.)

In July 2005 MacGibbon reviewed Ziegler's business plan update and determined that Ziegler only had active strategies in seven of his twenty-eight accounts.  In a

21

July 15, 2005, email, MacGibbon informed Ziegler that his business plan "only represent[ed] positive activity in 25% of [his] territory" which was "not acceptable," and that "[w]ith only 28 accounts [he] need[ed] to have an active strategy in each account . . . in order to create additional opportunities." (MacGibbon Dep. Ex. 32.) (ECF No. 38-9.) MacGibbon also told Ziegler that she was "very disappointed in [his] management of the overall territory" and that she "removed UW from [his] assignment in January to allow [him] more time to focus on all [his] accounts" and that "[b]y this time, [she] hoped to see more progress across [his] territory." (*Id.*) MacGibbon also noted that Ziegler was projecting sales losses in many of his accounts. (*Id.*)

In response to MacGibbon's email, Ziegler acknowledged that he had decided on a business strategy of only focusing on twenty-percent of his accounts and that such a strategy was a "risk." (Ziegler Dep. Ex. 13; Ziegler Dep. 176:14-177:9, 202:22-203:6.)

*MacGibbon Places Ziegler on a Territory Action Plan*

On July 21, 2005, MacGibbon and Mason met with Ziegler to review his business plan. After this meeting MacGibbon again noted that Ziegler only had "active strategies with 6 accounts,[9]" that he had "indicated [he] made a conscious decision to focus exclusively on these accounts" and that Ziegler "stated [he] had not personally called on many of [his] second tier accounts (Beloit Hospital, Beaver Dam Community Hospital, Consultant's)

---

[9]This proposed finding, based on ¶ 54 of Abbott's SOF, differs from the preceding statement that he had active strategies in seven of his accounts, based on ¶ 52 of Abbott's SOF. However, both statements are undisputed. (*See* EEOC Resp. SOF ¶ ¶ 52 & 54.)

in 4-6 months." (MacGibbon Dep. Ex. 33.) According to Ziegler, Mason was "mean" to him, saying "You should be ashamed of yourself. 29-year veteran." (Ziegler Dep. 165-66.) Ziegler felt "beat up" during the meeting, as if they were "taking kicks" at him. (*Id*. at 184:18-186:18.) It was obvious to Ziegler they were "after" him. (*Id.* at 186:5–18.)

MacGibbon placed Ziegler on an informal Territory Action Plan ("TAP"). MacGibbon consulted with Abbott's Human Resources ("HR") department before placing Ziegler on the TAP, and she worked with HR personnel to develop the specific parameters of the TAP which consisted of three components: Account Specific Action Plan (a plan to identify opportunities in each of Ziegler's twenty-eight accounts); Rapid's Action Plan (a plan to focus on Abbott's Rapid products and identify Rapid opportunity within his territory); and Account Coverage Plan (a plan to meet with all of his accounts every 30 days and a requirement that each Monday morning he email MacGibbon his weekly plan for meeting with customers). The TAP also required that Ziegler and MacGibbon speak each Monday at 4:00 p.m. to discuss Ziegler's progress.

Ziegler was told the TAP would be discontinued if he followed instructions and focused not just on high gain accounts, but also on low gain accounts. (Ziegler Dep. 180:15-181:4.) If Ziegler reached the goals of the plan by September 16, 2005, the TAP would be "successfully concluded." However, if Ziegler failed to reach the goals, there would be further consequences such as placing Ziegler on a formal Performance Improvement Plan ("PIP").

23

At the time MacGibbon placed Ziegler on the TAP, she had not observed, nor had she been made aware of, any performance issues with the other salespeople in her district similar to those of Ziegler, and she did not consider the consent decree to have a greater impact on Ziegler's ability to meet performance expectations than it had on any of the other salespeople in her district.

On July 29, 2005, Ziegler responded to MacGibbon's email concerning the TAP and thanked MacGibbon for her advice and suggestions. Ziegler did not indicate that he objected to the TAP or that he thought it was discriminatory. Ziegler further stated, in part: "I really want this to work. I value my employment at Abbott. I've always been proud of Abbott and proud of myself as an Abbott employee. I've contributed for over 29 years and feel that I can contribute for many more." (Ziegler Dep. Ex. 17.) MacGibbon and Ziegler met almost every Monday during the TAP to discuss his progress. They also exchanged numerous emails summarizing these weekly updates. Ziegler advised MacGibbon in advance each week about the number of sales calls he planned to make, where they were, and what his objectives were. MacGibbon's emails regarding the TAP did not say the proposed call volume was inadequate.

While the TAP was in effect, MacGibbon continued to receive customer reports regarding the Ziegler's performance. In August 2005 she learned that Ziegler had not visited his Beaver Dam Community Hospital account ("Beaver Dam") since Christmas 2004. MacGibbon learned this when another ADD salesperson, Storlie, visited Beaver Dam after he

24

was mistakenly told it was a new account for him. Because the account had not seen Ziegler since December 2004, they assumed Storlie was their new sales representative. MacGibbon informed Ziegler that Storlie had made a "series of sales calls" on Beaver Dam and had developed possible sales there, (Ziegler Dep. Ex. 19, WK000200), that Storlie had earned the right to service the account, and that it was being transferred to him.

Ziegler believed he had multiple call points at Beaver Dam, and that his relationship there was strong. Phyllis Tratar, Beaver Dam's laboratory director at the time, was impressed with Ziegler's performance as a sales representative for Abbott. He spoke to her, and to the people in the laboratory, and was very good at following up.

In September 2005, MacGibbon received complaints concerning Ziegler's performance at Kenosha Hospital. (Ziegler Dep. Exs. 24 & 26; Ziegler Dep. 229:16-235:10.) Robert Hintzke ("Hintzke"), an ADD product specialist who had accompanied Ziegler on a call, sent an email informing MacGibbon that

> "the call . . . should have been a 30 minute call to cover . . . four points, [but] the call went for more than two hours and the customer from my observation was very FRUSTRATED and [the customer] told [Ziegler] that we had to end the call. . . . [Ziegler] is not a take charge individual when it comes to being the leader of a sales call. [Ziegler] does not seem to get his thoughts organized/well prepared. [Ziegler] does not seem to bring much to a sales call when he does speak, lots of wasted conversation. . . . [Ziegler] just did not organize the call or people well, this was just a two hour waste of time. . . . Both [customers] find it to be a waste of time/uncomfortable when it comes to meeting with [Ziegler]. . . . [The customer] does not think that [Ziegler] is a take charge individual/sales representative."

25

(Ziegler Dep. Ex. 24, WK 000280.)

On September 13, 2005, MacGibbon forwarded Hintzke's email to Baldino and wrote, in part, that during a follow up visit to Kenosha Hospital she had determined that Ziegler was not "losing business for Abbott." (*Id*). However, she "suggested their decision to extend their relationship with Abbott is complicated by their lack of confidence in their rep." (*Id.*) "This may involve immediately transitioning the account to another rep." (*Id.*) She also wrote:

> [t]his type of repeated feedback from [Ziegler's] customers is very concerning. *Although he is meeting the commitments of the [TAP],* observations continue to indicate he is not selling. I do not know how to coach someone to bring value to their accounts. As we near the end of the informal plan, I would like to discuss our next steps with you and Jay.

(*Id.*) (Emphasis added.) She did not tell Ziegler that he was meeting the commitments of TAP.

The following day MacGibbon advised Ziegler of her concerns via email. Specifically, she informed Ziegler that:

> [b]ased on feedback from the Abbott Specialist and the customer, your meeting was completely unsuccessful in making any progress with clinical chemistry. The customer felt there were several specific issues, which needed to be addressed. You were not prepared to drive the meeting to meet the customer's objectives. The customer felt the meeting should have taken 30-45 minutes, yet it continued for over 2 hours, without accomplishing anything. This caused a great deal of frustration for the customer and the Abbott team. This frustration was so obvious to the Abbott Hematology Specialist, he felt compelled to return to the lab and apologize to the customer for wasting their time. . . . [The customer] openly admitted [to MacGibbon] they felt [Ziegler] often d[id] not bring value to their meetings. They

26

> feel [Ziegler] d[id] not always understand their priorities and d[id]
> not tailor [his] meetings to address their priorities.

(Ziegler Dep. Ex. 26, WK 000238-239.)

The email to Ziegler, also stated "[h]owever, they do feel you are very dedicated to their facility and extremely responsive with any request. For this reason, they are comfortable working with you." (*Id*.) She informed Ziegler "[y]our informal plan is scheduled to conclude this Friday. Although you have demonstrated improvement, it has not been significant. After much consideration, I feel the most appropriate next step is to continue your improvement plan, by moving to formal Performance Improvement Plan ["PIP"]" (*Id.*) Baldino was copied on the email.

Also on September 14, 2005, MacGibbon accompanied Ziegler on a day of field travel and provided him with a report. (Ziegler Dep. Ex. 25 at WK 000059-62.) MacGibbon noted problems with Ziegler's performance on his sales calls. First, she remarked that on their call to Waukesha Memorial Ziegler had "no clear opening, as to the purpose of [their] meeting" with the director of purchasing for the lab. (*Id*. at WK 000059.) MacGibbon stated that the customer "seem[ed] confused by [Ziegler's] opening question" and that Ziegler "did not cover [his] planned agenda or use [his] high gain question." (*Id.*) At their next call that day, also at Waukesha Memorial, MacGibbon observed that Ziegler should have had "a clear opening outlining the objectives of the meeting" and that he could have "facilitated the flow of discussion more succinctly." (*Id*. at WK 000059-60.) However, she also commented that "[i]t was a very positive meeting and we accomplished our objectives." (*Id*. at WK 000060.)

27

In 2005, Ziegler made instrument sales to the State of Wisconsin Drug Abuse Corrections Center ("DACC") and Waukesha Memorial. The sale to DACC closed in August for $311,600, and the sale to Waukesha Memorial closed in December for $425,000. Ziegler noticed that his 2005 sale to DACC was not announced to the rest of the district by MacGibbon. Her memo on the subject was sent only to "the limited group of people" who knew Ziegler was on the TAP, including Baldino. (Ziegler Dep. 227:6-7.) Ziegler's experience was that such successes were announced to "all members in the district" to "inspire them." (*Id*. at 224:5-10.) For example, Reinke had sent such an email to the district in regard to a September 2004 success by Ziegler.

Instrument sales led to the sales of reagents. In the case of DACC and Waukesha Memorial, the sales figures for reagents for 2005 and subsequent years were as follows:

| Rep. | Year | Waukesha Memorial | DACC | Total Net Dollars |
|---|---|---|---|---|
| Ziegler | 2005 | $399,991 | $376,173 | $776,164 |
| Storlie | 2006 | $595,447 | $362,539 | $957,986 |
| Storlie | 2007[10] | $699,677 | $433,195 | $1,132,872 |

Other younger sales representatives in the Milwaukee District had sales losses during the Consent Decree but were not terminated. Weyhrich, 10 years and four months

---

[10]Storlie's reagent sales figures to Waukesha Memorial and DACC for 2008-2010 are sealed. However, the reagent sales figures for both accounts increased in 2008 and 2009. In 2010, the reagent sales figures for both accounts decreased to a third of the preceding year's sales.

28

younger than Ziegler, made the President's Club in 2000 and 2003 but not 2001 (146 out of 180), 2002 (82 out of 102), 2004 (35 out of 92), or 2005 (78 out of 100). Murrow, four years Ziegler's junior, made the President's Club in 2003, but did not reach it in 2000 (91 out of 157), 2001 (51 out of 180), 2002 (67 out of 102), 2004 (46 out of 92), or 2005 (54 out of 100). Neither Murrow nor Weyhrich was placed on a PIP in 2005.

MacGibbon determined that Ziegler had not sufficiently met the TAP requirements, concluding that "[Ziegler] was not successful in executing strategies" for several customers; that while Ziegler had sales strategies for his top accounts, "[he] neglected to have a strategy developed for the balance of his territory;" that Ziegler failed to "adapt to the changing needs of [Abbott's] business environment;" and that "[h]e also displayed a limited ability to create opportunity in his accounts." (MacGibbon Dep. Ex. 34.) While Ziegler met some of the requirements of the TAP and had some success in making sales at one of his accounts—DACC—MacGibbon did not believe these events outweighed the negative performance she had observed and been made aware of during the TAP. MacGibbon's concerns about Ziegler's performance focused on the fact that he did not have active business strategies for the majority of his accounts and was not generating new business.

MacGibbon pursued the PIP despite the fact that Ziegler met the TAP commitments, as she had noted in her email to Baldino. As he indicated in his self-assessment, Ziegler felt he had addressed concerns regarding strategies and new business.

29

During the TAP, MacGibbon had not observed, nor had she been made aware of, any performance issues with the other salespeople in her district similar to those of Ziegler.

*MacGibbon Places Ziegler on a Performance Improvement Plan*

On September 14, 2005, MacGibbon told Ziegler she was placing him on a PIP. MacGibbon sought assistance from Abbott's HR Department regarding her management of Ziegler's performance, and began working with Laura Hennessy ("Hennessy"), who worked in ADD Employee Relations. MacGibbon provided Hennessy with all of the correspondence and documents she believed were relevant to the performance issues she was having with Ziegler. Hennessy reviewed the material and did not observe anything that caused her to question MacGibbon's assessment of Ziegler's performance shortcomings. Based on the information she had been provided by MacGibbon, Hennessy agreed that Ziegler should be placed on a PIP. MacGibbon advised Baldino of her decision to place Ziegler on the PIP. Baldino was not aware of any information that would have caused him to question MacGibbon's decision to move Ziegler to a PIP after she determined he had failed to meet the TAP requirements. At the time MacGibbon decided to place Ziegler on the PIP, she had not observed, nor had she been made aware of, any performance issues with the other salespeople in her district similar to those of Ziegler.

After MacGibbon told Ziegler she was going to place him on the PIP, she continued to receive additional negative feedback concerning Ziegler's performance. In October 2005, Mason provided MacGibbon with a summary of his field travel with Ziegler,

30

noting several areas where he felt Ziegler's performance was lacking. Specifically, Mason observed that Ziegler needed to "bring 'value' to the customer" on every call; he needed to work on stating a purpose at the beginning of every call, asking more open-ended questions, listening to his customers, doing a better job closing each call, improving his product knowledge and being more concise with his customers by having a "better game plan" going into each call so that the calls went beyond building rapport with customers and met actual sales objectives. (Ziegler Dep. Ex. 29, WK 000196-99.) Based on his perception that Mason was "mean" at the July 21, 2005, meeting Ziegler contests the objectivity of Mason's feedback. Ziegler had no reason to believe that Mason's observations of his performance were in any way motivated by his age, but he believes that Mason was mean spirited and acted as MacGibbon's henchman.

On October 6, 2005, Ziegler contacted Hennessy to discuss his PIP, and he informed her that he and MacGibbon had "a very good relationship" and that MacGibbon "had a collaborative approach." (Hennessy Dep. Ex. 83, AL 009449.) (ECF No. 45-4.)

Ziegler's PIP began on October 20, 2005. MacGibbon met with Ziegler that day and, as instructed by Hennessy, delivered Ziegler's 2005 performance assessment. (*See* MacGibbon Dep. Ex. 34.) MacGibbon also provided Ziegler with a memo explaining the requirements of the PIP. Ziegler received a PA rating for his overall assessment. (*Id.*) MacGibbon's performance appraisal given to Ziegler in October 2005, addressed adaptability as follows:

31

This is an area which has been consistently highlighted as an area of development for [Ziegler]. He has not been able to adapt to the changing needs of our business environment. He does not modify his behavior based on the needs of the customer or situation. For example, [Ziegler] seems to focus almost exclusively on the "service" side of his relationship with his customers, rather than the "selling" side.

(*Id*. at EEOC00165.) Ziegler responded, noting:

First and foremost, I've always considered myself very coachable. I've never thought that I "know it all" and have always been ready to learn. I truly enjoy learning new things. By 2005 I had effectively completed the focus to the "new ADD" and to new Architect & Sapphire placements. (This change was going on in 2004 as well.) I (we) need new Architect/Sapphire placements and we need them sooner, rather than later. I think most of my accounts would tell you that I've been focusing almost exclusively on Architect/Sapphire/Signify placement. Consent Decree issues are rarely visited today, and if they are, it's to mention that they've gone away. I am conscious of the need to adapt and try my best to adapt as necessary.

(Ziegler Dep. Ex. 32, WK003445.)

Ziegler's self-assessment for 2005 described his efforts, prior to his success at Waukesha Memorial. (Mason Dep. Ex. 85, WK 000274.) (ECF No. 45-2.) Ziegler stated that he was "attempting to close a large amount of Capital with a significant Reagent trail by yearend. [sic]" (*Id*.) This self-assessment was not disputed by Mason. The PIP presented to Ziegler set forth the background performance problems that lead to the PIP, including Ziegler's "Poor Territory Management," "Lack of product knowledge," "Inadequate understanding of the customers['s] needs," "Poor execution of the Face-to-Face Selling Model," and "Lack of pre-call planning." (MacGibbon Dep. Ex. 35.) (ECF No. 43-3.) The

32

PIP also laid out overall expectations, including requirements that Ziegler maintain an "Account Specific Strategy" for each customer, "identify the needs of [his] customers," "improve [his] product knowledge," engage in "[a]ggressive selling of new products," and "ensure [his] current business is secure." (*Id*. at EEOC 000171.)

The PIP also included a 90-day action plan of items for Ziegler to implement in order to "positively impact [his] performance," including "(4) Sales Calls per Day in 4 Different Accounts or Departments," "(4) Product Presentations Per Week," and "[d]emonstrate an improved use and understanding of the Face to Face Selling Model." (*Id*. at EEOC 000172.) The sales call requirement was new, and an increase from that in his performance assessment of "[f]ield travel 4 days per week, average minimum of 3 sales calls per day." (*Id*. Ex. 34, EEOC 000159.) (ECF No. 34.)

As of October 31, 2005, Ziegler was ranked 71st out of 101 sales representatives in the combined stack rankings. In the individual stack rankings, Ziegler ranked 21st out of 101 for instrument sales, and 89th out of 101 for new business. Ziegler's rank as of August 2005 was "52/105." (*Id*. at EEOC 000163.)

When Ziegler was placed on the PIP, one salesperson in his district—Weyhrich—ranked lower than Ziegler in the stack rankings.[11] MacGibbon had not observed, nor had she been made aware of, any performance issues with Weyhrich similar to those of Ziegler.

---

[11]There is a factual dispute between the parties regarding the reason for Weyhrich's low ranking. (*See* EEOC Resp. SOF, ¶ 86.)

After MacGibbon placed Ziegler on the PIP, she continued to observe and receive complaints concerning Ziegler's performance shortcomings. Burke reported, after accompanying Ziegler on field travel on October 18, 2005, that he would have liked to "see more strategic pre-call planning" by Ziegler, and he "was surprised that [they] only made calls on two accounts" that day and that Ziegler "did not begin [their] first appointment until 10:00 a.m." (Ziegler Dep. Ex. 37.) Burke reminded Ziegler that "[t]he expectations are that each Central rep should make customer contacts with at least 5 accounts/contacts each day. You did not accomplish this today. If this is a typical day, it would explain the challenges that you have experienced in your assignment this year." (*Id.*) Burke's report lists Zeigler as "Achieves Expectations" in most of the sales skills and essential job functions. (*Id.* at AL 003890.) Regarding sales call volume, Burke's report confirms three contacts at Consultant's Lab and one contact at DACC. (*Id.*)

On November 16, 2005, MacGibbon accompanied Ziegler on a day of field travel and provided Ziegler with a summary of her observations, noting several areas where Ziegler needed to improve. MacGibbon had the following comments when Ziegler presented an account Business Review to Midwest Clinical Labs:

> [T]he tone of [Ziegler]'s review did not reflect the business environment of the account. Within the last 12 months, the amount of Abbott business in this account has decreased by 50%, as they made the decision to move all chemistry and IA business to Beckman for the next 7 years. [Ziegler] chose to lead the review with an overview of their relationship with Abbott and the new business opportunities this relationship would present. This discussion was confusing to the account, as it did not reflect their

34

> recent decisions. [Ziegler] made an appointment with [the customer] for a Business Review. However, [Ziegler] did not set any expectations as to what this meeting would cover. The customer was very unclear as to the purpose of the meeting. Because of this, the discussion was initially strained and uncomfortable. At the conclusion of the review, [Ziegler] presented the new pricing. . . . This was not an appropriate proposal.

(MacGibbon Dep. Ex. 62, WK 000002-3.) The Business Review was a requirement under the PIP. "(1) Account Business Review per month to your Top 10 accounts to the key decision makers, showing the last 12 months and future opportunities." (*Id*. Ex. 35, EEOC 000172.)

On November 28, 2005, MacGibbon presented Ziegler with a 30-day review of his PIP noting that Ziegler failed to meet the "Overall Expectation" of having an Account Specific Strategy to protect and grow his business, and that while Ziegler "had increased his sales focus beyond his top (5) accounts," he had not "funnel[ed] these random initiatives into a specific strategy for each account" and had failed to "identify product opportunities or risk and the specific gain or loss associated with each." ( *Id*. Ex. 36, EEOC 000175.) Regarding the "Overall Expectation" of identifying the needs of his customers, MacGibbon noted at the 30-day point that, while [Ziegler] was beginning to better identify the needs of his customers through pre-call preparation and open questioning, he "ha[d] a long way to go" and still "d[id] not listen to the customer's direction." (*Id*.) MacGibbon provided the following example: "[The customer], from Midwest Clinical Labs, expressed frustration when [Ziegler] presented their revised contract. [Ziegler] had many AxSYM products (DAUs and TDMs) on the

35

contract. [The customer] stated that he had told [Ziegler] several times these products would be moving to the Beckman platform." (*ld.*)

As to the last "Overall Expectation" of ensuring the security of his current business, MacGibbon noted that Ziegler had executed one new contract for additional business, but that "[n]o other contracts or purchasing agreements have been presented in the last 30 days." (*Id*. at EEOC 000176.)

MacGibbon's 30-day review also noted that Ziegler had failed to present four new presentations per week to generate business, that the only account Business Review Ziegler presented "did not reflect the business environment of the account," and that Ziegler failed to "set any expectations as to what this meeting would cover. The customer was very unclear as to the purpose of the meeting. Because of this, the discussion was initially strained and uncomfortable" and that it "was not an appropriate proposal." (*Id*. at EEOC 000177-178.)

The 30-day review of PIP also stated "[Ziegler] is working to improve his product knowledge;" "[Ziegler] has submitted all materials on time and participated in all scheduled weekly updates" . . . "[Ziegler] has increased his field travel days per week; [Ziegler] presented between 1-3 new product presentations per week" . . . "[Ziegler] presented an account Business Review" . . . "completed Territory Review Business Plan" . . . "[Ziegler] has improved his administrative responsiveness" (*Id*. at EEOC 000175, EEOC 000177-178.)

The 30-day review also stated that while Ziegler had worked to improve his understanding of the Face-to-Face selling model, he still needed to work on this skill and this

36

requirement "remain[ed] an area of focus." (*Id*. at EEOC 000178.) Baldino and Hennessy both reviewed and signed off on MacGibbon's 30-day review, but neither participated in drafting the Review. Neither Baldino nor Hennessy had any reason to question MacGibbon's assessment of Ziegler's performance.

While Ziegler had met some of the requirements of the PIP during the first 30 days and had some success in making sales at one of his accounts—Waukesha Memorial—MacGibbon did not believe these achievements outweighed the negative performance she had observed and been made aware of concerning Ziegler. MacGibbon's concerns about Ziegler's performance focused on the fact that he did not have active business strategies for the majority of his accounts and was not generating new business.

Following Ziegler's 30-day review, MacGibbon continued to observe ongoing problems with his performance. While Ziegler had implemented a better strategy of identifying his customer's needs at Waukesha Memorial, MacGibbon noted that he failed to use a similar approach with his other customers, and that Ziegler still needed to work on applying his product knowledge to his customer interactions and communicating all new product launches to his customers. Ziegler had presented a new CPR[12] agreement to Midwest Clinical Labs, but he had failed to present any "other contracts or purchasing agreements . . . in the last 30 days." (*Id*. Ex. 37, EEOC 000181.) Ziegler had failed to present four new presentations per week to generate business, had not presented an Account Business Review

---

[12]The parties' submissions do not indicate meaning of the acronym "CPR."

in the last thirty days and, while Ziegler had worked to improve his understanding of the Face-to-Face selling model, he still needed to work on this skill and this requirement "remain[ed] an area of focus." (*Id*. at EEOC 000182-183.)

MacGibbon summarized these concerns in her December 22, 2005, 60-day review of Ziegler. While Ziegler had met some of the requirements of the PIP during the 30 through 60 day period, MacGibbon did not believe these achievements outweighed the negative performance she had observed and been made aware of concerning Ziegler. MacGibbon's concerns about Ziegler's performance focused on the fact that he did not have active business strategies for the majority of his accounts and was not generating new business. Baldino and Hennessy both reviewed and signed off on MacGibbon's 60-day review. Neither participated in the drafting of the 60-day review or had any reason to question MacGibbon's assessment of Ziegler's performance.

After MacGibbon presented Ziegler with his 60-day review, she continued to receive additional negative feedback concerning Ziegler's performance. Mason observed that Ziegler still needed to work on "making more than 2 calls per day" and that the "minimum expectations would be 3 to 4 account calls per day." (WK000247.)[13] MacGibbon continued to observe many of the same issues with Ziegler's performance. In Ziegler's 90-day review, dated January 30, 2006, she noted that regarding the "Overall Expectation" of having an Account Specific Strategy to protect and grow the business in each account, that "the quality

---

[13]This document could not be located within the parties' submissions, and the accuracy of this undisputed quotation could not be confirmed.

of [Ziegler]'s calls falls short of the minimum expectations. . . . [Ziegler] is unprepared with the necessary proof sources." (MacGibbon Dep. Ex. 38, EEOC 000185.) Regarding the "Overall Expectation" of identifying the needs of his customers, MacGibbon observed that "[t]hrough the 90 day PIP process, [Ziegler] has not been able to universally apply this objective to his customer base. At times, his approach is very comprehensive . . . [O]ther times, his approach is very scattered and inconsistent with the customer's needs." (*Id.*) MacGibbon also noted that while Ziegler had increased his field travel days per week, his sales calls were "repetitive and superficial" and he used "several calls" "to accomplish steps which should be accomplished in a single call." (*Id*. at EEOC000187.)

MacGibbon observed that Ziegler had failed to present four new presentations per week to generate business, had not presented an Account Business Review in the last thirty days which was "not consistent with the goals of the [PIP]" and that while Ziegler had worked to improve his understanding of the Face-to-Face selling model, he failed to implement specific opening and closing questions, despite being directed to do so in his 60-day review. (*Id*. at EEOC000187-188.) In conclusion, MacGibbon stated that:

> [Ziegler] has made a genuine effort to adhere to the guidelines of the [PIP]. There have been specific improvements. . . . However, [Ziegler] consistently demonstrates a lack of core competency skills. He is able to physically cover his territory, but he is not able to consistently sell to his customers. His call objectives lack urgency and specificity. He is not routinely prepared with the sales tools and support materials to move the cycle forward. When [Ziegler] does apply these principles to the management of his territory (Waukesha [Memorial], DACC), he is successful.

39

However, [Ziegler] does not consistently apply these tactics. [Ziegler's] primary job function is to sell.

(*Id*. at EEOC000188.)  With respect to the seven items on the PIP, the 90-day review states:

> (1) [Ziegler] has submitted all materials on time and participated in all weekly updates . . . (2) [Ziegler] has increased his field travel days per week . . . (3) [Ziegler] has presented multiple new product presentations per week . . . (4) [Ziegler] has not presented an Account Business Review in the last 30 days.  Overall, he presented a business review to Midwest Clin Lab and Children's Memorial . . . (5) Completed Territory Review Business Plan . . . (6) [Ziegler] continues to meet his administrative requirements . . . (7) [Ziegler] has worked to improve his selling skills by more closely adhering to the Face-to-Face selling Model.

(*Id*. at EEOC000187-188.)

*MacGibbon Recommends Termination of Ziegler's Employment*

In late January 2006, MacGibbon concluded that Ziegler had not satisfied the requirements of his PIP.  At the time MacGibbon reached this conclusion, she had not observed, nor had she been made aware of, any performance issues with the other salespeople in her district similar to those of Ziegler, and MacGibbon did not consider the consent decree to have a greater impact on Ziegler's ability to meet performance expectations than it had on any of the other salespeople in her district.

While Ziegler had met some of the requirements of the PIP, and had some success in making sales at one of his accounts—Waukesha Memorial—MacGibbon did not believe these achievements outweighed the negative performance she had observed and been made aware of during the TAP.  MacGibbon's concerns about Ziegler's performance

40

continued to focus on the fact that he did not have active business strategies for the majority of his accounts and was not generating new business.

Ziegler finished 2005 ranked 43 out of 100 sales representatives, and he made 104% of his combined total sales goals, which reflected achievement of 88% of his reagent/service goal and 273% of his capital goal.[14] While Ziegler had been ranked 71st at the end of October 2005, he moved up in the rankings due to a sale or sale(s) end of the year.

The other sales representatives in Ziegler's district were ranked as follows. Hoschek was 41st overall; 73rd for capital sales, 51st for new business, 32nd for reagents and 12th for percentage of new business to base. Lindley was 50th overall; 79th for capital sales, 45th for new business, 37th for reagents and 29th for percentage of new business to base. Murrow was 54th overall; 79th for capital sales, 36th for new business, 35th for reagents and 56th for percentage of new business to base. Peterson was 58th overall; 32nd for capital sales, 79th for new business, 24th for reagents and 74th for percentage of new business to base. Weyhrich was 78th overall; 79th for capital sales, 35th for new business, 76th for reagents and 85th for percentage of new business to base.

Neither Murrow nor Weyhrich was placed on a PIP in 2005. While Lindley, Murrow, Peterson, and Weyhrich were ranked below Ziegler in the stack rankings as of the end of 2005, MacGibbon had not observed, nor had she been made aware of, any performance

---

[14] Despite the undisputed fact cited above, the record also includes documentary evidence indicating that as of the end of 2005, Ziegler was 43rd out of 99 salespeople in the stack rankings. (Herchenbach Dep. Ex. 19 at AL 002906-2911 ) (ECF No. 42-4.)

Case 2:10-cv-00833-RTR   Filed 03/29/13   Page 41 of 63   Document 68

issues with these employees similar to those of Ziegler. In addition, all of the salespeople in Ziegler's district were ranked above Ziegler in three of the four categories, including new business sales.

MacGibbon recommended that Abbott terminate Ziegler's employment, and spoke to Hennessy and Elizabeth Mobarak ("Mobarak"), who had joined the ADD HR department in the fall of 2005, about Ziegler's potential termination. When making the decision to terminate Ziegler's employment, she did not consider the consent decree to have a greater impact on Ziegler's ability to meet performance expectations than it had on any of the other sales personnel in her district, and she had neither observed nor been made aware of, any performance issues with the other salespeople in her district similar to those of Ziegler. At the time MacGibbon made the termination decision, she did not consider that Ziegler was about to reach his 30th anniversary with Abbott or whether his termination would have any effect on his qualification for special early retirement under Abbott's pension plan. MacGibbon did not terminate Ziegler's employment to reduce salary costs in her district, and she was under no directive to identify head count reductions in order to save money on salaries.

Ziegler presented his 2005 through 2006 Business Overview to Mason and MacGibbon on January 24, 2006. The Business Overview cited Ziegler's successes in closing capital and the projected reagent sales for the coming years.

42

On the same day, Hennessy provided a summary of Ziegler's performance issues to Mobarak via email. The email did not list Ziegler's President's Club rank or list any sales figures. It listed overall performance appraisal ratings for only 2003, 2004, and 2005.

Mobarak then emailed the information to her manager, Peggy Taylor ("Taylor"). Taylor sent an email back to Mobarak saying "This will need [a]pproved by [Stephen] Fussell since over 20 years. I will forward it on to him." (Mobarak Dep. at 83:1-9; Ex. 139.) (ECF No. 45-6.) The emails between Mobarak and Taylor were dated January 25, 2006, five days prior to the date of the 90-day PIP review. Taylor also forwarded the information to Fussell, Abbott's Senior Vice President of HR. On January 26, 2006, Fussell advised Taylor that Ziegler's termination could proceed, stating that "[i]t's probably safe to assume that a PA four years running isn't going to turn around." (*Id.* Ex. 145.) However, Ziegler's overall performance evaluation for 2002, within four years of the termination of his employment by Abbott was EE.

At the time Fussell was advised of Ziegler's proposed termination, MacGibbon also advised her manager, Rytell, who then advised his manager, Don Patton ("Patton"), of MacGibbon's recommendation. Neither Rytell nor Patton expressed any opposition to MacGibbon's decision.

In light of Ziegler's length of employment, Mobarak also recommended that Abbott provide Ziegler with compensation for a period of eight months following his termination.

43

On January 30, 2006, Hennessy and MacGibbon met with Ziegler to provide him with his 90-day review, advise him that Abbott was terminating his employment, explain the bases for the decision, and offer him the post-termination severance that Mobarak had recommended. At the meeting MacGibbon followed the script given to her by Hennessy. Ziegler was surprised and very upset. According to MacGibbon, Ziegler thought he had passed the PIP. The letter given to Ziegler at the termination meeting included a provision requiring him to give up any claims under the ADEA in order to receive pay continuation benefits. Ziegler declined the pay continuation package offered by Abbott.

Hennessy, Abbott's Employee Relations Specialist, who was involved in Ziegler's termination, did not ask MacGibbon or Baldino if Ziegler's PIP or termination were motivated by his age. Mobarak, Abbott's Director of Business HR, who was involved in Ziegler's termination, did not recall asking MacGibbon or Baldino if age was a motivating factor in the decision to terminate Ziegler's employment. Hennessy received a copy of Baldino's email stating, in reference to Ziegler's "Energy and Excitement Level," that Ziegler needed to "get that 'swagger' back." She did not feel that she had a reason to talk to Baldino about it. Hennessy's electronic file on Ziegler's PIP lists the ages of Ziegler and MacGibbon and describes Ziegler as the "SUBJECT" and MacGibbon as the "CLIENT." (Hennessy Dep. Ex. 83, AL 009458.)

Following the February 3, 2006, termination of his employment Ziegler requested his personnel file. Hennessy asked MacGibbon to forward to her any additional

44

documents in her possession relating to Ziegler's performance issues. Hennessy already had the documents MacGibbon had provided her when the two first conferred about Ziegler's performance issues in September 2005. Hennessy obtained a copy of any personnel documents that Abbott maintained concerning Ziegler's employment. On February 13, 2006, Hennessy sent Ziegler copies of all responsive documents. Hennessy issued several memos to various Abbott personnel including, but not limited to, Abbott's corporate records department, MacGibbon, and Reinke, advising them to maintain and not destroy any documents related to Ziegler's employment with Abbott. Hennessy also kept a hard-copy file of all documents provided to HR concerning Ziegler's employment with and termination from Abbott.

*Jason Storlie*

Storlie moved from a service position to a sales position with Abbott in February 2005. He had previously informed the sales managers, including Baldino and MacGibbon, that he was interested in getting into sales. Coleman Chuen ("Chuen"), a manager, hired Storlie for the sales position. At the time Storlie lived in Jackson, Wisconsin, roughly the center of Ziegler's territory. Storlie's first sales territory covered northern Wisconsin and northern Michigan, and he reported to Chuen.

45

After Ziegler's termination from Abbott MacGibbon assigned the majority of Ziegler's accounts to Storlie,[15] who was 34-years old, had less sales experience at Abbott than Ziegler, and fewer educational degrees. Storlie reported to MacGibbon as a sales representative in 2006. Abbott promoted Storlie to Key Account Executive on February 13, 2006, and he took over a new territory at that time. The bulk of the new accounts had been Ziegler's.

According to Storlie's 2006 performance appraisal, his reagent sales in the territory in 2006 (88%) were similar to Ziegler's, and the dollar amount of capital sales was less ($615,000, compared to Ziegler's $707,370 in 2005).

Storlie's 2006 performance appraisal, with MacGibbon providing "next level approval,"[16] stated:

> [Storlie] was promoted into a challenging territory early in 2006. Through his drive, determination and knowledge of the customers he re-established some strained customer relationships. This action has, and will continue, to pay dividends for [Storlie] and his territory. *Although the reagent numbers were a challenge*, [Storlie], again, excelled with Capital sales of $615K.

(Tyndall Decl. ¶ 3, Ex. G, AL 011842) (emphasis added). (ECF No. 44-2.) Storlie's need to improve sales skills also was not a problem:

---

[15]There is a factual dispute regarding who was assigned the remainder of Ziegler's accounts. (*See* EEOC's Resp. SOF ¶ 135.) However, the EEOC also states that, according to Abbott's records, all but four of Ziegler's accounts were assigned to Storlie. (*Id.*) There is also factual dispute about when MacGibbon decided to assign Ziegler's accounts to Storlie. (*Id.* at ¶ 136.)

[16]Weyhrich , Storlie's direct manager at the time, presented the evaluation to Storlie. After its presentation, MacGibbon approved the evaluation.

46

> [Storlie] should continue to develop his core selling, business and organization skills through practice, experience, collaboration and feedback. These can be important learning and honing elements that will help lead him to continued success. [Storlie] will have additional learning and development opportunities as he develops as a leader within the Milwaukee District. An additional area of focus for [Storlie] should be the completion of administrative activities in a timely and accurate manner

(*Id.*) And his energy was noted with approval:

> If [Storlie] maintains his high expectations mind set and high energy enthusiasm while exercising his account specific strategies, especially with penetration into some of the Milwaukee area accounts, I expect great things for [Storlie] and his territory. And, I look forward to supporting [Storlie] in his pursuit of excellence.

(*Id.*)

Storlie's old territory in northern Wisconsin and the upper peninsula of Michigan was taken over by Andrew Herbert ("Herbert"). In Herbert's 2006 performance assessment approved by MacGibbon, Herbert was given credit for retaining business that was leaving Abbott:

> [Herbert] assumed responsibility of his territory in mid year 2006. His territory was transitioning away from Abbott in many areas and [Herbert] was charged with stopping this transition while learning about the industry, our products and his customers. Upon assuming territory responsibility, [Herbert] dedicated time to understand the current business climate then strategized and acted to stabilize the Business and prevent further "bleeding."

( *Id*. ¶ 4, Ex. H, AL 011876.) The "bleeding" had started in the previous year:

> While part of the focus of our company is to build the organization, one of the key areas that [Herbert] focused on in his

47

> 6 months in the territory in 2006 was to stabilize the business
> losses. There was a considerable amount of bleeding starting in
> 2005, and he focused on retaining business.

(*Id.* at AL 011875.) MacGibbon acknowledged that the losses Herbert was working to stabilize were in Storlie's old territory, from before Storlie was assigned Ziegler's territory. The 2006 performance appraisals for Storlie and Herbert included "High energy level" in Core Job Responsibility 6, "Drive for Results." (*Id.* ¶¶ 3-4, Ex. G, H, AL 011835, AL 011868–869.)

*Ziegler's Discrimination Claims*

The EEOC alleges that Abbott violated the ADEA by terminating Ziegler's employment because of his age, and by unfairly disciplining him and failing to properly acknowledge his successful sales performance based on age bias, including age-based stereotypes. The EEOC also alleges that Abbott replaced Ziegler with a less-experienced, less-educated, but much younger sales representative who was not subjected to the same discipline and lack of acknowledgment as Ziegler.

Ziegler offered the following reasons as indication that he was discharged because of his age: (1) He did "everything that [he] was asked to do, in terms of performance;" he "cleared" his PIP. (Ziegler Dep. 7:12-21); (2) He was "at the top of [his] game" for selling, and his sales were "the best they had ever been." ( *Id.* at 7:22-24); (3) He was the oldest person in his district in 2006; (4) MacGibbon demonstrated that she did not want to be "associated" with "older people" because in one meeting during his employment,

48

she did not acknowledge Ziegler's presence even though he was sitting next to her, and on one other occasion told Ziegler not to attend a golf outing ( *Id*. at 39:2-18); (5) Two former co-workers, Larry Harding ("Harding") and Derek Schaller ("Schaller"), who were not supervised by MacGibbon, told Ziegler they believed that they were discriminated against, however neither Schaller nor Harding ever stated they believed they were discriminated against because of their age; (6)  Three other former co-workers, O'Brien, Murrow and Moskal, told Ziegler they believed he was discriminated against because of his age (*Id*. at 54:21-68:19); however, Ziegler only had "general" conversations with these individuals, and none of them identified any specific reasons as to why they believed Ziegler had been discriminated against because of his age.

At his deposition, Ziegler noted that his employment was terminated just before his 30th anniversary with Abbott, and just prior to his qualification for special early retirement benefits under Abbott's pension plan, which he estimated amounted to a monthly loss of $262. Ziegler also testified that, sometime in 2005 MacGibbon had remarked that pathologist Collin Johnson ("Johnson") who worked for an Abbott customer, was "not involved in the decision to buy the chemistry analyzers."  When Ziegler asked why, MacGibbon responded "because he's old." ( *Id*. at 321:8-12.)  Ziegler also testified that a second time while visiting that customer MacGibbon remarked that Johnson looked "old."[17] (*Id*. at 321:25-322:4.)  At his

---

[17]MacGibbon does not recall saying that "Johnson looked old." (ASA, Ex. C (MacGibbon Dep.) 248.) She testified that "when we first took over the account and the [sic] came back on the territory, I called on . . . Johnson, probably 20-years prior, and I recall waiting to meet with him and commenting to [Ziegler] and smiling, "oh, he's aged." (*Id*. at 248-49.)

49

deposition, Ziegler could not recall when these remarks were made, but he thought they were made sometime in 2005. However, Ziegler's notes from early 2006, shortly after his termination from Abbott, indicate that MacGibbon made the second remark about Johnson's age in the fall of 2005.

*More Favorable Treatment of Other Younger Comparators*

With respect to his overall PA rating in 2003, when he received AE ratings for "Competencies" and "Core Job Responsibilities" and a PA rating for "Goals," Ziegler compares himself to the following younger sales representatives who, unlike him, received overall AE ratings in the evaluations despite receiving AE ratings for "Competencies" and "Core Job Responsibilities" and a PA rating for "Goals." For 2003, Ziegler points to Zocher, whose performance evaluation was signed by Reinke and Baldino. For 2004, Ziegler points to Lindley, whose performance evaluation was approved by MacGibbon; and Weyhrich and Murrow whose performance evaluations were signed by MacGibbon and Baldino. For 2005, Ziegler points to Hoschek, whose performance evaluation was approved by MacGibbon; and MacGibbon who signed her own evaluation, as an employee.

Other younger sales representatives in Ziegler's district received favorable performance appraisals for 2005. Lindley, 20 years younger than Ziegler, closed no capital sales, had "lost deals" at two customers, and "worked to improve" his product knowledge and general laboratory knowledge. (Mason Dep. Ex. 155, AL 011574-75, AL011578.) (ECF No. 45-3.) Lindley was promoted at the end of 2005, with approvals by Mason and MacGibbon.

50

Hoschek, 26 years younger than Ziegler, did not meet her three territory-specific sales goals, missed two out of three of her territory-specific new product sales goals, had no clinical chemistry placements, and was "beginning to demonstrate proficiencies in her product knowledge and competitive knowledge" and "now need[ed] to use this knowledge to build and execute strategic account specific plans." (*Id*. Ex. 157, AL 011444-455.)    Mason and MacGibbon approved her overall AE rating.

*Sales Force Under MacGibbon*

Under MacGibbon the age of the Chicago/Milwaukee District Sales Force decreased between 2005 and 2006.  The changes included Ziegler and Murrow leaving and Storlie and Herbert arriving.

Ziegler believes that during MacGibbon's supervision of him, from 2005 until January 2006, she demonstrated that she did not want to associate with him.  Her behavior included not acknowledging Ziegler's presence while he sat next to her at a business meeting; telling him it would be better if he did not attend a golf outing with other district colleagues; and, in Ziegler's opinion, "shunn[ing]" him.  (Ziegler Dep. 39:2-45:13.)

*Additional Topics*

During their employment with Abbott, Reinke, MacGibbon and Baldino received training regarding Abbott's Equal Employment Opportunity policies.  The training covered

51

age discrimination. Reinke and MacGibbon could not recall any training about age stereotypes.[18]

   While several of Ziegler's customers had favorable opinions of his performance, none of them had any reason to believe his termination was because of his age, and none of them spoke with anyone at Abbott concerning their opinions of Ziegler's performance. Four of Ziegler's customers provided the following favorable comments: he was good about providing products and information, and "on top of it" in getting information to the lab (Diane Breitenfeld ("Breitenfeld"), Dynacare; Breitenfeld Dep. 15:1); he was a "phenomenal" representative who would go "above and beyond the call of duty" and gave "great customer service" (Paul Jannetto ("Jannetto"), Dynacare; Jannetto Dep. 8:5–9:11); he had always been helpful and did his job well, advised them timely about new products, was supportive of the customer and Abbott, and they were disturbed when he was replaced (Deborah Dekker ("Dekker"), Waukesha Memorial; Dekker Dep. 10:22-11:1); he was "one of the best Abbott salesmen that I had," he was "very attentive," he "followed through on everything" (Carol Rowe ("Rowe"), Wisconsin Department of Corrections; Rowe Dep. 6:12-7:5). (ECF Nos. 46-4, 46-5, 46-6, 46-7.)

   Ziegler's replacement, Sorlie, was regarded as "a little bit standoffish" (Breitenfeld Dep. 19:18-20:7), but after Breitenfeld discussed her issue with him, his

---

[18]This finding is based on the EEOC's response to paragraph 142 of Abbott's proposed finding of fact. However, it has been modified as to Baldino, whom the EEOC also asserted could not recall training regarding age stereotypes, as unsupported by Baldino's cited testimony. Instead, Baldino testified that "[t]he way your defining–I can't answer it." (Baldino Dep. 261:14-15.)

52

performance improved; he took a year to pick up an old piece of equipment (Rowe Dep. at 7:7-8:10); and he was "no . . . Ziegler" in terms of "the level of service." (Jannetto Dep. 11:9-12:18.)

## Analysis

The ADEA makes it unlawful for an employer to "discharge any individual or otherwise discriminate against any individual with respect to his . . . terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1); *see also,* 29 U.S.C. § 631(a) (limiting protections to individuals over 40). *Gross v. FBL Financial Services, Inc.* held that the ADEA's language proscribing discrimination "because of" age requires the plaintiff to prove at trial that age was the but-for cause of the adverse employment action. 557 U.S. 167, 176 (2009). Therefore post-*Gross* cases require ADEA plaintiffs to show evidence that could support a jury verdict that age was a but-for cause of the employment action at the summary judgment stage. *Fleishman v. Cont'l Cas. Co.,* 698 F.3d 598, 604 (7th Cir. 2012) (citing *Barton v. Zimmer, Inc.,* 662 F.3d 448, 455-56 (7th Cir. 2011)). "In other words, proof that the plaintiff's age was a motivating factor, but not a determinative factor, in the employer's decision, will not suffice to establish the employer's liability." *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 961 (7th Cir. 2010).

An employee suing under the ADEA may show discrimination directly or indirectly. *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 297 (7th Cir. 2010). Abbott asserts that it is entitled to summary judgment dismissing the EEOC's claims because the

53

EEOC cannot raise a genuine issue of fact that Ziegler was fired because of his age under either the direct or the indirect method of proof. The EEOC contests both of Abbott's contentions.

*Indirect Method*

To establish a *prima facie* case of age discrimination under the indirect method, the EEOC must prove that (1) Ziegler is a member of a protected class (which he is, being 40 or older); (2) his performance met Abbott's legitimate expectations; (3) despite his performance he was subject to an adverse employment action and (4) Abbott treated similarly situated employees under 40 more favorably. *Fleishman*, 698 F.3d at 609*; Naik v. Boehringer Ingelheim Pharm., Inc.,* 627 F.3d 596, 599-600 (7th Cir. 2010). The burden then shifts to Abbott to offer a legitimate, nondiscriminatory reason for the adverse employment action. *Fleishman,* 698 F.3d at 609. If Abbott meets this burden, the EEOC must demonstrate that the reasons offered were pretextual. *Id. See also Egonmwan v. Cook Cnty. Sheriff's Dep't,* 602 F.3d 845, 850 (7th Cir.2010).

Abbott does not contest that Ziegler is a member of a protected class and that he was subjected to an adverse employment action, the first and the third prongs of a *prima facie case* of age discrimination. However, it asserts that Ziegler was not performing according to its legitimate expectations, and that it did not treat similarly situated employees differently.

54

With respect to the second prong of a *prima facie* case, Abbott contends that Ziegler had documented performance problems for three years: he ranked last in his sales district in three of four critical categories; his customers were complaining; and he did not call on the majority of his customers. The EEOC responds by asserting that Ziegler was performing near the top in his district, second out of six sales representatives, at the time his employment terminated. The EEOC states that "Ziegler never should have been in danger of losing his job for non-performance." (Pl.'s Resp. Br. Opp'n Summ. J., 17.) (ECF No. 41.)

Ziegler focuses solely on his sales figures and President's Club rankings. However, Abbott evaluated an ADD sales representative's performance under a performance evaluation system that considered three categories: core job responsibilities; goals; and competencies. These three categories were weighted evenly—each counted for one-third of the overall performance evaluation. The goals category included sales. The record establishes that, for three consecutive years—from 2003 to 2005—Ziegler had an overall PA rating, a rating that, along with the NA rating, encompassed the lowest performing 5% of the ADD sales force. The 2003 and 2004 ratings were given to Ziegler by Reinke. The 2003 rating was attributed to Ziegler's decrease in sales numbers, and he does not question that determination. Nor does Ziegler assert that Reinke's evaluations of him were related to this age.

Beginning in 2003 and continuing through 2005, Ziegler's performance evaluations, the customer complaints, the documented field travels, and the results of the TAP and PIP establish that Ziegler was not performing according to Abbott's legitimate

55

expectations. Negative input regarding Ziegler's job performance was received from Reinke, MacGibbon, Baldino, Mason, Burke, UW-Madison, and Kenosha Hospital. These multiple sources support Abbott's determination that Ziegler was not performing according to its legitimate employment expectations. Despite considering the evidence, and the reasonable inferences therefrom, in the light most favorable to Ziegler regarding positive aspects of his job performance, any improvements he demonstrated while on the TAP and/or the PIP, and any favorable customer opinions are insufficient to allow a reasonable jury to conclude that Ziegler was performing according to Abbott's legitimate job expectations.

However, because the EEOC argues that Ziegler performed satisfactorily and Abbott spent two years documenting criticisms of his sales techniques despite their success, the second prong and the pretext question seemingly merge because the issue is the same—whether Abbott is lying. *See, e.g., Benuzzi v. Bd. of Educ. of City of Chi.*, 647 F.3d 652, 663 (7th Cir. 2011); *Hague v. Thompson Dist. Co.*, 436 F.3d 816, 822 (7th Cir. 2006) ("The defendant's expectations are not legitimate if they are phony; so if they are argued to be phony, the issue of legitimate expectations and the issue of pretext seem to merge.") Thus it is appropriate for the Court to also address pretext.

To show that Abbott's reason is a pretext, Ziegler must show that Abbott's explanation is unworthy of credence or that it is more likely a discriminatory reason motivated the employer's actions. *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir.1986) (citation omitted). The plaintiff may demonstrate that the employer's reason is unworthy of

56

credence by providing "evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation . . . or were insufficient to motivate" the action. *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 888-89 (7th Cir. 2001) (citation omitted). The Court's inquiry is limited to whether Abbott honestly believed the reason it gave for its decision to terminate Ziegler's employment, and not whether it made a mistake or a bad business decision. *Kralman v. Ill. Dep't of Veterans' Affairs*, 23 F.3d 150, 156-57 (7th Cir. 1994).

In contending that Abbott spent two years repeatedly documenting criticisms of Ziegler's sales techniques despite their past and continuing success, the EEOC attacks Abbott's documentation, stating that "Ziegler's termination was unfairly conceived and kept on track toward his inevitable replacement," although he adhered to the TAP and willingly accepted the coaching he received, and "different treatment was given to all other sales representatives who were less successful." (Pl.'s Resp. Br. Opp'n Summ. J., 15.) The EEOC's indirect attack is not supported by a "scintilla of proof, evidence or substantiation" to support its claim. Thus, that contention is insufficient to show pretext. *Cichon v. Exelon Generation Co., L.L.C.,* 401 F.3d 803, 813 (7th Cir. 2005).

The EEOC asserts that Ziegler met the requirements of the TAP, relying on MacGibbon's statement in her September 13, 2005, email to Baldino. However, the EEOC cites only a portion of MacGibbon's email. It also states "although he is meeting the

57

commitments of the TAP, observations continue to indicate he is not selling. I do not know how to coach someone to bring value to the accounts."

The Court does "not sit as a super-personnel department that reexamines an entity's business decisions." *Dale,* 797 F.2d at 464. "No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [the ADEA does] not interfere." *Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 560 (7th Cir. 1987). Rather, the Court's inquiry is limited to "whether the employer gave an honest explanation of its behavior." *Id.* An unwise employment decision does not automatically rise to the level of pretext; rather, a party establishes pretext with evidence that the employer's stated reason or the employment decision "was a lie—not just an error, oddity, or oversight." *Van Antwerp,* 627 F.3d at 298. The EEOC has fallen short of presenting evidence that calls into question the veracity of Abbott's reason for terminating Ziegler's employment.

Based on the foregoing, the Court concludes that the EEOC has not presented sufficient evidence under the indirect method of proof to overcome Abbott's summary judgment motion. Having so concluded, it is unnecessary to address the EEOC's contentions regarding possible alternative formulations of the fourth prong of the indirect method of proving age discrimination. (*See* Pl.'s Resp. Br. Opp'n Summ. J., 13-15.)

58

*Direct Evidence*

Regarding the EEOC's age discrimination claim under the direct evidence method, taken literally the direct evidence method would require an admission by the employer. *Fleishman,* 698 F.3d at 603. However, circumstantial evidence that "points directly to a discriminatory reason for the employer's action," is permitted. *Id*. This type of direct evidence is also called a "convincing mosaic" of circumstantial evidence, but fundamentally the plaintiff must connect the circumstantial evidence to the employment action such that a reasonable juror could infer that the employer acted for discriminatory reasons. *Id*. (citing *Rhodes v. Ill. Dep't of Transp.,* 359 F.3d 498, 504 (7th Cir. 2004)). To survive summary judgment on its ADEA claim, the EEOC must offer evidence from which an inference of discriminatory intent can be drawn, such as: "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Teruggi v. CIT Group/Capital Fin., Inc.*, No. 12-2314, 2013 WL 628324 at *4 (7th Cir. Feb. 21, 2013) (citing *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522,* 657 F.3d 595, 601 (7th Cir. 2011)).

The EEOC relies on three categories of direct evidence. First, it claims the record shows suspicious timing and ambiguous statements because Ziegler's employment was terminated shortly before his 55th birthday, while he was still officially on the PIP and after

59

his sales numbers had recently risen; and that Storlie, his younger replacement, had already received one of Ziegler's accounts and was poised to take over the remainder. The EEOC also asserts that Ziegler's supervisors made statements to him about his energy and excitement level and getting his swagger back, and MacGibbon, his direct supervisor, made two ageist comments to him about a customer.

In the second category, the EEOC states that Ziegler was terminated immediately after a successful year in which he was the second highest performer in his district, 12th out of 36 in his region, and 43rd out of 100 in the country; and the more than half of sales representatives who ranked below him in 2005 were not subjected to a PIP or termination because of sales performance.

In the third category, the EEOC relies on the evidence that the asserted reasons for the termination, a series of purported problems with his sales technique, are pretextual in light of his "overall" strong performance and the unfairness applied to him "in the march toward termination." (See Pl.'s Resp. Br. Opp'n Summ. J., 13-15.) It maintains that the evidence that MacGibbon and Baldino terminated their oldest sales representative, when Ziegler was at the top of his game, and replaced him with a twenty year younger and less experienced employee before Ziegler completed the PIP, and without regard to his objective success, is sufficient for a jury to "infer" that age was the reason for his termination.

Rather than focusing on the types of evidence, this Court considers whether the "mosaic" of circumstantial evidence points directly to Abbott's discriminatory intent. In

60

asserting suspicious timing and ambiguous statements, the EEOC does not provide context in which Ziegler's increased sales occurred—while he was under the rigorous obligations of the TAP and the PIP, which required an increase in sales calls and preparation. Furthermore, in her 90-day evaluation of Ziegler under the PIP, MacGibbon noted that when Ziegler prepared himself with the sales tools and support materials he was successful, citing his Waukesha Memorial and DACC sales; however, she concluded that he did not consistently apply such tactics.

Although Storlie had already received the Beaver Dam account, the consideration of the circumstances of the transfer of that account is critical: Storlie mistakenly visited the account thinking it had been assigned to him, and he developed a relationship with the hospital personnel who thought they had a new sales representative because they had not seen Ziegler for roughly eight months. While Storlie's territory is disputed, for the purposes of summary judgment the EEOC's verison is taken as true. Storlie is considered as infringing on Ziegler's territory.

Baldino's statements about Ziegler's energy and excitement level and getting his swagger back, are the types of statements that Baldino routinely made to sales representatives. Under these circumstances, they cannot be reasonably be considered ageist. Again, resolving the dispute about whether MacGibbon made statements about Johnson's age in favor of the EEOC, the second of those remarks was made in the fall of 2005 and, even if construed as ageist, they are stray statements with insufficient temporal relationship to the

61

termination of Ziegler's employment.  Compare *Duncan v. Fleetwood Motor Homes of Ind., Inc.*, 518 F.3d 486, 490 (7th Cir. 2008) (regarding an employer allegedly commenting that the older workers 'no longer could do many things,' even though the plaintiff, age 51, was performing the essential functions of his job).

Two points must be made regarding the other circumstantial evidence relied upon by the EEOC.  First, Baldino's involvement with Ziegler's employment issues ended in late December 2005.  Second, given Abbott's sizable management structure as reflected in the record, the fact that the termination process began a few days before the end date of Ziegler's PIP does not support discriminatory intent.  The rest of the circumstantial evidence upon which the EEOC relies has been discussed in conjunction with the Court's analysis under the indirect evidence method of proof.  Suffice it to say that it is not the role of the EEOC or this Court to re-craft Abbott's criteria for evaluating its employees, or assign different weights to that criteria.

While there were positive developments in Ziegler's performance, from Abbott's perspective, overall the negative aspects of his performance outweighed the positives.  Considered in its totality, and viewed in the light most favorable to the EEOC, a reasonable jury could not find that the EEOC's mosaic of circumstantial evidence points directly to a discriminatory reason for Abbott's decision to terminate Ziegler's employment, as required to overcome summary judgment.  *See Fleishman,* 698 F.3d at 603.

62

From Ziegler's perspective, his sales career as a sales representative with Abbott came to an end just shy of his 30th year in an unsatisfactory manner. However, the EEOC has not presented sufficient evidence upon which a reasonable jury could find in favor of Ziegler on his claim of age discrimination against Abbott. Therefore, Abbott's motion for summary judgment dismissing this action is granted.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

The EEOC's request to amend/correct the record (ECF No. 61) is **GRANTED IN PART** and **DENIED IN PART**;

Abbott's motion for summary judgment (ECF No. 36) is **GRANTED,** and this action is **DISMISSED** with prejudice;

Pursuant to Fed. R. Civ. P. 54(d), Abbott is **AWARDED** costs only to the extent authorized by law; and

The Clerk of Court is **DIRECTED TO ENTER JUDGMENT** accordingly.

Dated at Milwaukee, Wisconsin this 29th day of March, 2013.

**BY THE COURT**

**Hon. Rudolph T. Randa**
**U.S. District Judge**

63